

ORIGINAL

SEALED

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 1 5 2016

CLERK, U.S. DISTRICT COURT
By_____
Deputy

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| v. | **Criminal No. 3:15-CR-163-K** |
| | (Supersedes indictment returned on June 23, 2015) |
| **HECTOR OSCAR MOLINA (01),** | |
| **BLANCA MATA (02),** | |
| **LIDIA ANTONIO (03),** | |
| **IVAN CASTILLEJA (04), and** | |
| **GEORGE RICHARD RIVAUX (05)** | |
| | |
| Defendants. | |

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

### Introduction

At all times relevant to this Indictment, unless otherwise specified:

### General Allegations

#### A. The Medicare and Medicaid Programs

1.     The Medicare program ("Medicare") was a federal health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services.  Medicare provided benefits to individuals aged 65 and older and some persons under 65 with recognized disabilities.

2.     Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3.     Individuals who qualified for Medicare benefits were commonly referred to as Medicare beneficiaries.

4.     Physicians that provided services to Medicare beneficiaries were referred to as "Medicare providers." To participate in the Medicare program, providers were required to submit an application in which they agreed to comply with all Medicare related laws and regulations. As part of that application, providers certified that they would not knowingly present or cause to be presented, a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

5.     Each provider was required to obtain a National Provider Identifier ("NPI"). The NPI was the standard unique identifier for health care providers.

6.     Each Medicare provider was also assigned a Medicare provider number ("PIN"), which allowed the Medicare provider to submit claims to Medicare to obtain payment for services rendered to beneficiaries.

7.     To receive payment from Medicare, providers submitted claims to Medicare, either directly or through a billing company.

8.     To bill Medicare for services rendered, a provider submitted a CMS claim Form 1500. When a Form 1500 was submitted, usually in electronic form, the provider certified:

   a.  the contents of the form were true, correct, and complete;

2

b. the form was prepared in compliance with the laws and regulations governing Medicare; and

c. the services being billed were medically necessary.

9.    The Form 1500 also must include the date on which the Medicare provider purportedly performed the service.

10.    When submitting each claim, the provider was required to identify the type of service performed by means of the Healthcare Common Procedure Coding System (HCPCS). The HCPCS used alphanumeric codes for every task and service a provider could render to a Medicare beneficiary including medical, surgical and diagnostic services. The code used by the provider in the claim submission dictated the amount of payment the provider received from Medicare for the purportedly rendered service.

11.    When submitting the claims, providers also indicated, by means of other alphanumeric codes, where the service was performed (i.e. at the beneficiary's home or in a doctor's office).

12.    The Texas State Medicaid program (Medicaid) was a federally and state funded program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including Texas.

13.    Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3

**B. Physician Home Visits and Office Visits**

14.     Medicare provided coverage for outpatient evaluation and management services, which may be provided in an office setting as well as in a beneficiary's home. Evaluation and management services provided in a beneficiary's private residence were commonly referred to as "physician home visits."   A bill for a home visit could be submitted to Medicare using one of several different Current Procedural Terminology (CPT) codes, including but not limited to 99345, 99349 and 99350.   These CPT codes were defined as follows:

a.   99345 – Home visit for the evaluation and management of an established patient… Physicians typically spend 75 minutes face-to-face with the patient and/or family.

b.   99349 – Home visit for the evaluation and management of an established patient… Physicians typically spend 40 minutes face-to-face with the patient and/or family.

c.   99350 – Home visit for the evaluation and management of an established patient… Physicians typically spend 60 minutes face-to-face with the patient and/or family.

15.     A bill for an office visit could be submitted to Medicare using one of several different CPT codes, including but not limited to 99204.  CPT 99204 is an office visit for the evaluation and management of a new patient regarding a problem of moderate to high severity requiring three key components: 1) a comprehensive history; 2)

4

a comprehensive examination; and 3) medical decision-making of moderate complexity. Typically, 45 minutes are spent with the patient.

16.     Medicare required that a home visit could only be billed by a physician if the physician was actually present in the beneficiary's home. If a physician assistant or nurse practitioner provided the home visit, Medicare requires that they be enrolled as a Medicare provider, and that the home visit be billed under the physician assistant or nurse practitioner's National Provider Identification number. The Medicare reimbursement amount for home visits provided by a physician assistant or nurse practitioner was less than the reimbursement amount for a physician.

## C. Home Health Services

17.     The Medicare program paid for home health services only if the patient qualified for home healthcare benefits. A patient qualified for home healthcare benefits only if:

    a.   the patient was confined to the home, also referred to as homebound;

    b.   the patient was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care (POC); and

    c.   the determining physician signed a certification statement specifying that:

        i.   the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

        ii.   the beneficiary was confined to the home;

        iii.   a POC for furnishing services was established and periodically

5

reviewed; and

    iv.  the services were furnished while the beneficiary was under the care of the physician who established the POC.

18.    The Medicare program paid for home health services only if a face-to-face patient encounter, which was related to the primary reason the patient required home health services, occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home healthcare and was performed by a physician or allowed non-physician practitioner.   The face-to-face encounter had to be performed by the following:

    a.  The certifying physician himself or herself;

    b.  A physician, with privileges, who cared for the patient in an acute or post-acute care facility from which the patient was directly admitted to home health;

    c.  A nurse practitioner or a clinical nurse specialist, who was working in accordance with state law and in collaboration with the certifying physician; or

    d.  A physician assistant under the supervision of the certifying physician.

19.    Medicare Part A regulations required HHAs providing services to Medicare beneficiaries to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their beneficiaries, as well as records documenting actual treatment of the beneficiaries to whom services were provided and for whom claims for payment were submitted by the HHA.

20.     These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

21.     Among the written records required to document the appropriateness of home healthcare claims submitted under Part A of Medicare was a POC, which included the physician order for home healthcare, diagnoses, types of services, frequency of visits, prognosis, rehabilitation potential, functional limitations, activities permitted, medications, treatments, nutritional requirements, safety measures, discharge plans, goals, and physician signature.  A POC signed and dated by the physician, or a signed and dated written prescription, or a verbal order recorded in the POC were required in advance of rendering services.

22.     Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services. This certification statement was generally included on the signature line of the POC.

23.     Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, or home healthcare aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition.  The home healthcare nurse, therapist, or aide was required to document the hands-on personal care provided to the beneficiary if the

services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "visit notes" and "home health aide notes/observations."

### D. Care Plan Oversight

24.    Care Plan Oversight (CPO) was the physician supervision of a beneficiary receiving complex or multidisciplinary care as part of Medicare-covered home health services or hospice. In performing CPO, a physician was expected to coordinate an aspect of the beneficiary's care with the home health agency or hospice. In order for a provider to bill for this service, Medicare required CPO of recurrent physician supervision involving 30 minutes or more of the physician's time per month.

25.    For billing and reimbursement purposes, Medicare directed providers to describe CPO by using CPT code G0181. CPT codes were shorthand descriptors of services defined by the American Medical Association and widely available to health care providers. CPT code G0181 was defined as the: "Physician supervision of a patient receiving Medicare-covered services provided by a participating home health agency (patient not present) requiring complex and multidisciplinary care modalities involving regular physician development and/or revision of care plans, review of subsequent reports of patient status, review of laboratory and other studies, communication (including telephone calls) with other health care professionals involved in the patient's care, integration of new information into the medical treatment plan and/or adjustment of medical therapy, within a calendar month, 30 minutes or more."

26.     Physicians claiming payment for CPO services were required to document in their records the CPO services they furnish, including the dates and exact duration of time spent on the services for which payment is claimed. CPO was recognized by Medicare as a physician service and had to be provided and documented only by the responsible physician.

<u>Individuals and Entities</u>

27.     Defendant **HECTOR MOLINA**, a resident of Irving, Texas, was a medical doctor who was licensed by the State of Texas. **HECTOR MOLINA** was the owner and operator of three entities: Molina Medical Housecall Services, PA, dba U.S. Medical Housecall Services, PA (Housecall Services); SANUS Health Care, Inc. (SANUS); and Park Row Medical (Park Row). Housecall Services was located in Dallas, Texas. Park Row Medical was located in Arlington, Texas, and SANUS was located in Quinlan, Texas. The billing for SANUS was performed at Housecall Services.

28.     Defendant **BLANCA MATA**, a resident of Forney, Texas, was an employee of Housecall Services and was not licensed by the State of Texas as a medical doctor and did not hold any other medical license in the State of Texas. **BLANCA MATA** fraudulently portrayed herself as a physician, physician assistant, or nurse practitioner for Housecall Services.

29.     Defendant **LIDIA ANTONIO**, a resident of Irving, Texas, was also an employee of Housecall Services and was not licensed by the State of Texas as a medical doctor and did not hold any other medical license in the State of Texas. **LIDIA**

**ANTONIO** fraudulently portrayed herself as a physician, physician assistant, or nurse practitioner for Housecall Services.

30.     Defendant **IVAN CASTILLEJA,** a resident of Dallas, Texas, was a biller and manager for Housecall Services and billed Medicare and Medicaid on behalf of Housecall Services.

31.     Defendant **GEORGE RICHARD RIVAUX**, a resident of San Antonio, Texas, was an employee of SANUS and Housecall Services and a purported medical student. Although not a licensed physician assistant, **RIVAUX** fraudulently portrayed himself as a physician assistant when meeting with patients.

**Count One**
**Conspiracy to Commit Health Care Fraud**
**(Violation of 18 U.S.C. § 1349)**

32.     The allegations contained in paragraphs 1 through 31 are realleged and incorporated as though fully set forth herein.

33.     From on or about January 2010 through on or about April 2015, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendants **HECTOR MOLINA**, **BLANCA MATA**, **LIDIA ANTONIO**, and **IVAN CASTILLEJA** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347, that is, to knowingly and willfully execute, and attempt to execute, a scheme and artifice (a) to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicare, and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and

property owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Conspiracy

34.     It was a purpose of the conspiracy that the defendants and their co-conspirators, known and unknown to the Grand Jury, would unlawfully enrich themselves by submitting and causing the submission of false and fraudulent claims to Medicare and diverting the payments by Medicare on those claims for the personal use and benefit of the defendants and their co-conspirators.

### Manner and Means of the Conspiracy

35.     The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things:

36.     The defendant, **HECTOR MOLINA,** and others known and unknown to the Grand Jury, would pay or cause to be paid money to the defendants, **BLANCA MATA,** and **LIDIA ANTONIO,** and others known and unknown to the Grand Jury, to visit the homes of Medicare beneficiaries when **MATA** and **ANTONIO** were not authorized Medicare or Medicaid providers, and were not licensed physicians, nurse practitioners, or physician assistants.

37.     The defendants, **BLANCA MATA** and **LIDIA ANTONIO,** and others known and unknown to the Grand Jury, visited the residences of Medicare beneficiaries to purport to provide physician home visits without **HECTOR MOLINA** present. Defendants **BLANCA MATA** and **LIDIA ANTONIO** acted as, and fraudulently portrayed themselves to be, licensed physicians, nurse practitioners, or physician

assistants when they were not. Defendant **MOLINA**, a physician, would cause Medicare to be billed falsely as if he performed the physician home visits.

38.     The defendant, **HECTOR MOLINA** would further direct licensed physician assistants and nurse practitioners to conduct physician home visits when Defendant **HECTOR MOLINA** was barred by the Texas Medical Board from supervising physician assistants and nurse practitioners. Defendant **HECTOR MOLINA** would cause Medicare to be billed falsely for those physician home visits as if he had performed them personally, and not as if a physician assistant or nurse practitioner had performed them.

39.     The defendant, **HECTOR MOLINA,** and others known and unknown to the Grand Jury, including **BLANCA MATA, LIDIA ANTONIO,** and **IVAN CASTILLEJA** would submit and cause to be submitted false and fraudulent claims totaling approximately $5.3 million dollars to Medicare for physician home visits billed as if **MOLINA** performed the physician home visits when **MOLINA** did not perform the physician home visits.  Many of the said visits were medically unnecessary.

40.     Defendants **HECTOR MOLINA, IVAN CASTILLEJA,** and others known and unknown to the Grand Jury, would create and use documentation of the fraudulent physician home visits to justify the Medicare face-to-face requirements for home health care.

41.     Defendants **HECTOR MOLINA, IVAN CASTILLEJA** and others known and unknown to the Grand Jury, would cause home health face-to-face documentation required by Medicare to be falsely and fraudulently completed.

12

42.    Defendant **HECTOR MOLINA** would sign, or direct someone else to sign, the false face-to-face visit documentation required by Medicare when he, or someone authorized by Medicare, had not conducted a face-to-face visit with the beneficiary. Defendant **HECTOR MOLINA** would often pre-sign the face-to-face documentation before any face-to-face encounter had occurred or had purported to have occurred.

43.    Defendant **HECTOR MOLINA** would certify Medicare beneficiaries and direct others to certify Medicare beneficiaries for home health care when he, or someone authorized by Medicare, did not conduct a face-to-face visit with the beneficiary, when the beneficiary was not under **MOLINA's** care, and when there was no medical necessity for home health care.

44.    Based upon these fraudulent certifications of Medicare beneficiaries, home health care companies caused Medicare to be falsely billed approximately $19.8 million dollars for home health care.

45.    Defendants **HECTOR MOLINA** and **IVAN CASTILLEJA** would falsify CPO documentation, and would direct others known and unknown to the Grand Jury, including minor children under the age of seventeen, to falsify CPO documentation to make it appear as if **HECTOR MOLINA** spent the required 30 minutes on CPO.

46.    Defendant **HECTOR MOLINA** would often pre-sign the CPO documentation, and direct others to sign for him, before CPO had occurred or had purported to have occurred.

13

47.    Defendants **HECTOR MOLINA, IVAN CASTILLEJA** and others known and unknown to the Grand Jury would cause Medicare to be falsely billed approximately $3.5 million dollars for CPO.

In violation of 18 U.S.C. § 1349.

### Counts Two through Seven
### Health Care Fraud
### (Violations of 18 U.S.C. §§ 1347 and 2)

48.    The allegations contained in paragraphs 1 through 31 and 34 through 47 are realleged and incorporated as though fully set forth herein.

49.    Defendants **HECTOR MOLINA, BLANCA MATA, LIDIA ANTONIO, and GEORGE RICHARD RIVAUX** as specified below, on or about the dates specified below, in the Dallas Division of the Northern District of Texas, and elsewhere, aided and abetted by others and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice (a) to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicare, and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services by submitting, causing the submission, and aiding and abetting in the submission of false and fraudulent claims to Medicare seeking payment for services purportedly provided by **HECTOR MOLINA** that were fraudulently provided by the defendants specified below;

14

| Ct | Defendant | Beneficiary | Service Billed | Date of Service | Claim Number | Amount of Medicare Claim |
|----|-----------|-------------|----------------|-----------------|--------------|--------------------------|
| 2 | Blanca Mata | LS | Physician Home Visit 99350 | July 30, 2014 | 453214213451460 | $250.00 |
| 3 | Blanca Mata | DW | Physician Home Visit 99350 | August 4, 2014 | 453214218187090 | $250.00 |
| 4 | Lidia Antonio | MW | Physician Home Visit 99350 | February 20, 2014 | 453214050631210 | $250.00 |
| 5 | Lidia Antonio | DB | Physician Home Visit 99350 | February 15, 2014 | 453214052111860 | $250.00 |
| 6 | George Richard Rivaux | IB | Physician Office Visit 99214 | October 29, 2014 | 452914304491080 | $210.00 |
| 7 | George Richard Rivaux | PM | Physician Office Visit 99204 | November 21, 2014 | 452914330524450 | $250.00 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

### Counts Eight through Eleven
### Health Care Fraud
### (Violations of 18 U.S.C. §§ 1347 and 2)

50.     The allegations contained in paragraphs 1 through 31 and 34 through 47 are realleged and incorporated as though fully set forth herein.

51.     On or about the dates specified below, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant **HECTOR MOLINA**, aided and abetted by others and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice

(a) to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C.

§ 24(b), that is, Medicare, and (b) to obtain, by means of materially false and fraudulent

pretenses, representations, and promises, money and property owned by and under the

custody and control of Medicare, in connection with the delivery of and payment for

health care benefits, items, and services by submitting, causing the submission, and

aiding and abetting in the submission of false and fraudulent claims to Medicare seeking

payment for physician home visits purportedly made by **HECTOR MOLINA** when

**HECTOR MOLINA** was in fact outside of the United States:

| Ct | Beneficiary | Service Billed | Date of Purported Home Visit | Claim Number | Amount of Medicare |
|----|-------------|----------------|------------------------------|--------------|--------------------|
| 8 | GW | Physician Home Visit 99349 | February 17, 2011 | 452911061262150 | $200.00 |
| 9 | RC | Physician Home Visit 99349 | February 18, 2011 | 452911061262240 | $200.00 |
| 10 | DW2 | Physician Home Visit 99350 | May 22, 2014 | 453214149566620 | $250.00 |
| 11 | DB | Physician Home Visit 99350 | May 23, 2014 | 453214149566470 | $250.00 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

### Count Twelve
### Health Care Fraud
### (Violations of 18 U.S.C. §§ 1347 and 2)

52.    The allegations contained in paragraphs 1 through 27 are realleged and

incorporated as though fully set forth herein.

53.    On or about June of 2015, Medicare revoked **HECTOR MOLINA's**

Medicare billing privileges.

54.   Between or about January 16, 2016 to on or about March 16, 2016, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant **HECTOR MOLINA,** aided and abetted by others and aiding and abetting others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice (a) to defraud a health care benefit program affecting commerce, as defined by 18 U.S.C. § 24(b), that is, Medicare, and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, in connection with the delivery of and payment for health care benefits, items, and services by submitting, causing the submission, and aiding and abetting in the submission of false and fraudulent claims to Medicare by seeking payment for services purportedly provided by Dr. RH, for services that were not in fact provided by Dr. RH, including for those below:

| Beneficiary | Service Billed | Date of Purported Visit | Approx. date of claim | Claim Number | Amount of Medicare Claim |
|---|---|---|---|---|---|
| BA | Physician Office Visit 99204 | February 17, 2016 | February 26, 2016 | 452216050221480 | $275.00 |
| AG | Physician Office Visit 99204 | February 25, 2016 | March 4, 2016 | 452916057451190 | $275.00 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

### Count Thirteen
### Aggravated Identity Theft
### (Violations of 18 U.S.C. §§ 1028A and 2)

55.     The allegations contained in paragraphs 1 through 31 and 52 through 54 are realleged and incorporated as though fully set forth herein.

56.     Between on or about January 16, 2016 to on or about March 16, 2016, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant **HECTOR MOLINA,** aided and abetted by others and aiding and abetting others known and unknown to the Grand Jury, during and in relation to a violation of 18 U.S.C. § 1347 (Health Care Fraud) as set forth in count twelve of this indictment, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit; the Medicare provider information of Dr. RH, knowing that the Medicare provider information belonged to an actual person, namely Dr. RH, without Dr. RH's consent, by directing those known and unknown to the Grand Jury to bill for services provided by **HECTOR MOLINA** under Dr. RH's Medicare provider information, including for the services below:

| Beneficiary | Service Billed | Date of Purported Visit | Approx. date of claim | Claim Number | Amount of Medicare Claim |
|---|---|---|---|---|---|
| BA | Physician Office Visit 99204 | February 17, 2016 | February 26, 2016 | 452216050221480 | $275.00 |
| AG | Physician Office Visit 99204 | February 25, 2016 | March 4, 2016 | 452916057451190 | $275.00 |

Each in violation of 18 U.S.C. §§ 1028A and 2.

18

**Criminal Forfeiture**
**(18 U.S.C. § 982)**

57.    The allegations contained in paragraphs 1 through 56 are realleged and incorporated as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants have an interest.

58.    Upon conviction of any federal health care offense, namely the offenses in counts one through thirteen, the defendants **HECTOR MOLINA, BLANCA MATA, LIDIA ANTONIO, IVAN CASTILLEJA,** and **GEORGE RICHARD RIVAUX,** shall forfeit to the United States property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

59.    The property that is subject to forfeiture includes but is not limited to a money judgment in the amount of at least $28.6 million, which represents the approximate gross proceeds of the fraud.

60.    Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable property, including, but not limited to, any identifiable property in the name of the defendants **HECTOR MOLINA,** **BLANCA MATA, LIDIA ANTONIO, IVAN CASTILLEJA,** and **GEORGE RICHARD RIVAUX.**

All pursuant to 18 U.S.C. § 982(a)(7), and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C § 982(b)(1).

A TRUE BILL

FOREPERSON

JOHN R. PARKER
United States Attorney

JASON KNUTSON
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
Texas State Bar No. 24033928
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8792
Facsimile: 214.659.8805
Email: jason.knutson@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

HECTOR OSCAR MOLINA (01)
BLANCA MATA (02)
LIDIA ANTONIO (03)
IVAN CASTILLEJA (04)
GEORGE RICHARD RIVAUX (05)

SEALED
SECOND SUPERSEDING INDICTMENT

18 U.S.C. § 1349
Conspiracy to Commit Health Care Fraud

18 U.S.C. §§ 1347 and 2
Health Care Fraud

18 U.S.C. §§ 1028A and 2
Aggravated Identity Theft

18 U.S.C. § 982
Forfeiture Notice

13 Counts

A true bill rendered

FORT WORTH _____ FOREPERSON

Filed in open court this 15th day of June, 2016.

----------------------------------------------------------------------------------------------------

**Warrant to be Issued as to defendants Lidia Antonio (03), Ivan Castilleja (04), and George Richard Rivaux (05) ---- Hector Oscar Molina (01) and Blanca Mata (02) on bond since 05/08/2015**

----------------------------------------------------------------------------------------------------

_____

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending:  3:15-CR-163-K